REDACTED: PUBLIC COPY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**

███████████,

Plaintiff,

v.

MERRICK GARLAND,

In his Official Capacity as U.S. Attorney General,
Department of Justice, Federal Bureau of
Investigation, Agency,

and ███████████ Individually,

Defendants.

Civil Action File No.:

**JURY TRIAL DEMANDED**

**COMPLAINT FOR DAMAGES**

1. COMES NOW Plaintiff ███████, by and through counsel, and files her Complaint for Damages against Defendant Merrick Garland, in his official capacity as Attorney General of the United States, Department of Justice, Federal Bureau of Investigation, for discrimination, harassment, and retaliation on the basis race, sex, ██████████████ under Title VII. This action is also brought against Defendant ███████, individually, for law provisions in Michigan common law torts for battery, assault, and intentional infliction of emotional distress, including MCL 600.5805, MCL 750.520e, and MCL 750.520g, and respectfully shows to the Court as follows:

## I.    NATURE OF THE ACTION

2. Plaintiff ███████ (hereinafter referred to as "Plaintiff") brings this action against Defendant Merrick Garland (hereinafter referred to as "Defendant Garland"), in his official capacity as head of the Department of Justice ("DOJ"), Federal Bureau of Investigation ("FBI"),

REDACTED: PUBLIC COPY

Agency, under Title VII of the Civil Rights Act of 1964, as amended, for discrimination, harassment, and retaliation on the basis of sex, gender, ███████████████████████

3. While the EEO complaints subject to this litigation were filed in 2018 and 2020, respectively, the events that precipitate the tainted and discriminatory Office of Inspector General ("OIG") investigation, Office of Professional Responsibility ("OPR") referral and the Disciplinary Review Board ("DRB") dismissal of Plaintiff from the rolls of the FBI date back to ████ when Plaintiff was a ███████████████████ in the FBI's ███████████ ████████████ and shortly thereafter met ████████████████████ who was the ███████████████████ in the ██████ as the ████████████████████

4. This action is also brought against Defendant ████████ individually, for personal injury claims for ███████████ battery, and intentional infliction of emotional distress in violation of the common laws of Michigan including MCL 600.5805, MCL 750.520e, and MCL 750.520g.

5. Information about the interactions between Plaintiff and ████████ starting in ████████ form the basis of this Complaint as it demonstrates the FBI's inequitable and discriminatory referral of Plaintiff and ultimate removal from the FBI which forms the issues accepted in the ████████ and ████████ EEO Complaints.

## II.    JURISDICTION AND VENUE

6. Jurisdiction is proper in this Court because district courts have original jurisdiction over Title VII under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 2000e-16 (incorporating 2000e-5(f) through(k)), because they arise under the laws of the United States and are brought to recover damages for deprivation of civil rights. Jurisdiction is also provided by the by the doctrine of pendent party jurisdiction over Defendant ████████

REDACTED: PUBLIC COPY

7. Venue is proper in this judicial district under 28 U.S.C. § §1391(b)-(c) and 42 U.S.C. § 2000e-16(d), incorporating § 2000e-5(f)(3), because some of the events were directed by personnel in this district. Plaintiff is a resident of the State of ███████ Venue is proper against Defendant ████ because he ███████████████████████ in this jurisdiction.

### III.      ADMINISTRATIVE PROCEDURE

8. Plaintiff made two timely Equal Employment Opportunity Commission ("EEOC") complaints that are the subject of this action. The first EEOC Complaint relates to her removal from the rolls of the FBI. The second EEOC Complaint relates to the Disciplinary Review Board ("DRB") upholding the decision to remove Plaintiff from the rolls of the FBI and ███████, harassment, and retaliation. Plaintiff has exhausted her administrative remedies in both cases prior to bringing this suit. In her first complaint, she filed timely charges of discrimination; more than 180 days have passed since the appeal was made to the EEOC, and the EEOC has made no final determination of the claims. In her second complaint, she filed timely charges of discrimination with the FBI; more than 180 days have passed since the filing of the complaint, and the FBI has failed to complete its investigation within the 180 day period required by law. This action was timely filed thereafter.

9. This matter was previously filed in the United States District Court for the District of Columbia as Civil Action File No.: 1:20-cv-03553-TNM, because the FBI's Headquarters lies in that jurisdiction. However, the Court determined that it did not have supplemental jurisdiction over Defendant ████ for Plaintiff's common law tort claims against him. Civil Action File No. 1:20-cv-03553-TNM was dismissed on December 9, 2022, and this matter is being filed within 30 days thereof.

### IV.      PARTIES

<div align="center">**REDACTED: PUBLIC COPY**</div>

10. ███████████ is a female ██████████████████ of ████████ ████████████ She is a resident of the State of ████████ and a former employee of the FBI working in the ████

11. Defendant Garland is the Attorney General of the United States of America. Defendant Garland is named in his official capacity as the Attorney General, and as such is the head of the FBI.

12. Defendant Garland may be served with process at 950 Pennsylvania Avenue, NW, Washington, DC 20530.

13. Defendant ██████ served as the ██████ of the FBI ██████ from approximately ██████████ and as such was the highest-ranking agent in the ██████ He is a resident of the State of ██████

14. Upon information and belief, Defendant ██████ entered on duty as a special agent with the FBI in ████████████. He first reported to the ██████████████████████████ ████████, where he investigated violent crimes, gangs, and narcotics matters. He was also a member of the ████████████ and served as a firearms instructor.

15. Upon information and belief, in 2003, Defendant ██████ was promoted to supervisory special agent at FBI ████████████ where he was assigned as an ████████████████ ████████████. He later moved to the ██████████████████████ ████████.

16. Upon information and belief, Defendant ██████ returned to FBI ████████████ in ████ as the ████ of the ██████████████████████████████ In this role, he was responsible for all agent and professional staff transfers. In ██████ he was promoted to assistant special agent in charge of the ██████████████████████, where he also oversaw eight resident agencies and the administrative program.

<div align="center">4</div>

REDACTED: PUBLIC COPY

17. Upon information and belief, in 2009, Defendant ███ was promoted to chief of the ██████████████████████. While there, he supervised the FBI's payroll and personnel actions processing, transfers, employee relations, benefits, and awards programs, as well as the ████████████ Defendant ███ was then assigned ███ of the ████████ ██████████████████████, with responsibility for promotional processes and supervisor development.

18. Upon information and belief, Defendant ████ served as the ████ of the ████████ ██████████████████.

19. Upon information and belief, Defendant ████ served as the ████ of the ████ in ████ and ████.

20. Upon information and belief, in August ████ it was announced that Defendant ████ was transferring divisions and was moved to ████████████ in ████████████ as a special agent.

21. Defendant ████ may be served with process at ██████████████████████ ████.

## V.   EQUITABLE TOLLING AND ESTOPPEL

22. The statute of limitations is tolled based on the continuing violations doctrine, equitable estoppel, and equitable tolling, due to the duress and threats to Plaintiff by Defendant ████ if she told anyone about what happened and threatened Plaintiff if she were to complain. Because Defendant ████ held Plaintiff captive psychologically and through blackmail and threatened her life, his life, and harm to her family if she was to speak about the ████████ he committed against her, this along with the effect ████████ have on women caused Plaintiff to not be able to bring the claims presented until this time.

REDACTED: PUBLIC COPY

23. In fact, Plaintiff had previously filed EEOC complaints in ████████████ but did not proceed with a formal complaint in either incident due to the physical and mental threats by Defendant ████ that something bad would happen to her, to her and Defendant ████ both, and to Defendant ████ if she told anyone about what Defendant ████ did to Plaintiff.  He further threatened to have her children taken away, threatened her family and friends, and threatened her if she were to talk to anyone. He threatened to kill her and himself if she ever spoke about what happened.

24. Defendant ████ wrongful conduct that began while in ████████ continued after moving to ████ and into his retirement. In an effort to keep his name clear, Defendant ████ called Plaintiff's family and friends to persuade her to continue a relationship with him in order for her to not divulge information about what he had done during the course of his control over her. He continued to make harassing calls from unknown numbers to Plaintiff, causing her to continuously change her phone number to get away from Defendant ████.

25. Because Defendant ████ has as recently as ████████ in his individual capacity, reached out to family members of Plaintiff, as well as her ████ Plaintiff, through her counsel, sent a cease-and-desist to stop communication. He continued to reply with threats if she spoke of these events in ████████ It is only after obtaining the undersigned counsel who could, along with the courts, help protect her, that she was able to come forth under the protection of anonymity.

26. The type of emotional and physical abuse Defendant ████ used to command silence from Plaintiff and cover up his assaults has been studied by psychologists. Psychologists John Gottman and Neil Jacobsen, authors of <u>When Men Batter Women</u> (first published in 1998 and reissued in 2007), extensively researched emotional abuse and domestic violence and created a 27-question survey designed to help doctors establish whether patients were suffering from

REDACTED: PUBLIC COPY

systematic abuse at the hands of a partner. The four factors that determine emotional violence, Gottman and Jacobson concluded, were isolation, degradation, sexual abuse, and property damage. Each of these factors can be found in Defendant ████ abuse of Plaintiff.

27. Defendants should be barred from asserting the statute of limitations as a defense based upon Defendant ████ conduct in threatening and preventing Plaintiff from filing a timely EEOC charge as well as her tort claims against Defendant ████ at least until Plaintiff was able to finally disclose the abuse and victimization she faced by Defendant ████ which was in her EEO Signed Sworn Statement issued ████.

28. The statute of limitations is also tolled under the continuing violation doctrine because Defendant ████ conduct continued through ████.

29. As it pertains to the tort claims brought against Defendant ████ in his individual capacity, including civil assault, civil battery, and intentional infliction of emotional distress, those claims are similarly tolled by the common law doctrine that no person should benefit by their wrongful conduct, and that statutes of limitation may be extended when a plaintiff is unable to file due to duress or threats.

30. The tort claims against Defendant ████ as an individual remain timely because the Plaintiff did not fail to file due to lack of diligence, but rather because acts of violence and intimidation that prevented her from filing the claim. Once the cease-and-desist letter was sent to Defendant ████ and the estoppel ended, Plaintiff quickly filed the original action against him in ████. She knew she could file anonymously to protect herself and family once the case was under the jurisdiction of a federal court, where any further threats or intimidation could be immediately addressed before the court.

## VI.    FACTUAL BACKGROUND

REDACTED: PUBLIC COPY

A.  PLAINTIFF'S ███████████████ PROFESSIONAL BACKGROUND

███████████████████████ ████ ████ ██ ██ ████ █

████████████████████████████████████████████████

██████████████████████████████ █████ ██████ █████

██████████████████████████ ████ █████ ██████████

████████████ ████ ████ ████ █████████████████ ██

█████████████████████████████████ █████ ██████████

█████████████████ ██████ ██████

33. ██████████████████████████████ ██████████████

█████████████████

34. ██████████████████████████████████████

█████████████ █████ █████ ████████████

35. █████████████████████████████████████████████

████████████████████████████████████████████

36. █████████████████████████████████ Plaintiff attended college
and ultimately earned her master's degree in ███████████

37. Plaintiff was then recruited by the ███████████████ as a ████████ liaison where
she was known throughout the United States for her ability to help nurture, cultivate trust, and
build the relationship between the United States ████████ and the ██████████████████
Plaintiff served the ████████ with honor and received the highest ████████████ of honor every
single year of her service from start to departure.

38. Outside of Plaintiff's professional career, she is known throughout the State of ████████
for her work in ██████████████ She is known as a leader in ████████████████ and
spent much of her teen and adult life volunteering and coordinating efforts among ██████████
throughout the state of ██████████ including the ██████████████████████

39. Despite all of the accolades and accomplishments she has earned over the years, ████████
████████████████████████████████████████ ████████████████████

**REDACTED: PUBLIC COPY**



REDACTED: PUBLIC COPY



46. Because of Plaintiff's fear that Defendant ██████ would harm her or her family, he was able to silence Plaintiff for years, until ██████████ when she wrote her signed sworn statement for the EEOC proceedings.

B.  <u>OPERATIVE FACTS</u>

47. Plaintiff entered duty with the FBI in ████████████ as a direct hire after her work at the ████████████████ got the attention of the FBI Plaintiff received multiple offers that she initially refused before finally receiving an offer that included a retention incentive and was direct hired as a ██████████████████████ to help the FBI restore trust between law enforcement and community with a primary focus on ████████████████████████ ████████████████████████████

48. Plaintiff transitioned to the FBI because she believed in its mission of service and forging a better relationship between federal law enforcement and ████████████████ for crime prevention and effective intervention. Plaintiff was very successful in doing so on behalf of the FBI, and her productivity led to annual outstanding performance evaluations. The FBI continuously rated her an outstanding employee, receiving awards and highest recognitions from her inception date to her termination date.

49. In the process of applying and being hired to the FBI, Plaintiff submitted information related to her background and finances. She submitted to and passed a polygraph test before and after entering duty with the FBI and as part of her onboarding process. She also granted the FBI access to her financial records and referenced items in her Personal Security Interview pre-employment including a distressed sale of property that her ex-husband had brokered. Plaintiff

was not directly involved in the distressed sale. All of these items were reviewed in her background investigation to support her employment in the FBI and her top secret (SCI) security clearance.



52. Plaintiff filed an EEOC complaint outlining the discrimination based on her ████ ████████████ after the property defacement. However, instead of the person responsible for the action being identified, Plaintiff was subjected to increased scrutiny than white, male, and ████▌████████ peers. For example, ████████ Plaintiff was placed on a Post Adjudication Risk Management (PARM) Program due to ██████████████████████ No other FBI employee was placed on a PARM, including a white male colleague who had ████████████ ██████ Plaintiff was required to take another polygraph test without any new information being sighted. She passed that polygraph test.

53. Ultimately, Plaintiff abandoned her EEO complaints from ████ and ████ in fear of further retaliation by the FBI and Defendant ████ and further abuse by Defendant ████ as well as physical and mental threats made by Defendant ████ about her engaging in the EEOC process.

REDACTED: PUBLIC COPY

C.  <u>FACTUAL ALLEGATIONS RELEVANT TO DEFENDANT ██████ TIME IN ██████</u>

54.  Plaintiff first met Defendant ████ around ██████████ when he arrived at the ████ as the ████ He was the ████████████████ and a ████████████████ employee.

55. Defendant ████ made sure to tell Plaintiff over and over about his work in ████ ████████████ the control he had in that job, and the connections he continued to hold within FBI Headquarters.

56. In ████████ Defendant ████ began to single out Plaintiff by calling her into his office and demanding Plaintiff attend certain meetings with him. These meetings would often last over 1.5 hours and if Plaintiff would try to bring in a male colleague, because ████ ████████████████████████████████ Defendant ████ would require the male colleague to leave. While he understood these interactions made Plaintiff very uncomfortable, Defendant ████ continued to subject her to long, one-on-one, closed-door meetings.

57. In ████████ Defendant ████ first touched Plaintiff without her consent, trying to hold her hand and put his arm around her neck. Because of ████████ Plaintiff did not ████████████████. Because Defendant ████ was a federal law enforcement officer and her ultimate superior, Plaintiff was unsure how to counter his actions. Further, due to Plaintiff's ████████ ████████████████████ ████████████████████████ ████████████████████ ████████████

REDACTED: PUBLIC COPY

██████████    ████████    ███████████████

█████████████████████    ████████

59. Plaintiff later learned that during her divorce proceedings that Defendant ████ met with her divorce attorney without her knowledge or consent. He represented to her attorney that he was also an attorney and guided the divorce settlement, even though it was to Plaintiff's detriment. Ultimately, he did these things because he wanted to assert control over the outcome of the divorce.

60. At the end of ████████ Defendant ████ instructed Plaintiff that she needed to disclose to him everything related to her personal life after Plaintiff's ex-husband had a mental health outburst resulting in law enforcement being called to her home. He said it was FBI policy for Plaintiff to disclose this information to him as a high-ranking federal law enforcement officer. Instead of gathering information to protect Plaintiff, he used the information to blackmail, control, manipulate, and ultimately report her to the FBI's Office of Inspector General (OIG) to have her removed from the rolls of the FBI to gain complete control and submission, knowing she would be left with no financial income to █████████████.

61. In ████████ Defendant ████ relayed to Plaintiff that her former employer had issued a formal complaint about her and that her job with the FBI could be in jeopardy. Plaintiff is informed and believes, and thereon alleges, that no such complaint was ever made, since ████ ordered her to never follow-up about the alleged complaint to anyone. While Defendant ████ never produced a copy of that complaint, he created the false and fraudulent story to induce Plaintiff into submission in addition to using his position of power so as not to question his actions and maintain complete control over Plaintiff.

REDACTED: PUBLIC COPY

62.  In or around ██████████ Defendant ██████ told Plaintiff that he needed her work

phone and her personal phone for the FBI. He asked for the passwords to her phones, which she

provided to him because he was the ██████ and a federal law enforcement officer whose orders she

had to obey. Defendant ██████ did not have a warrant to examine Plaintiff's phone, nor any

probable cause to believe that she had committed a violation of law. After apprehending

Plaintiff's phones and passwords, Defendant ██████ would ask Plaintiff for her personal phone

during work hours and take it to his office. Defendant ██████ downloaded access to her phone,

without Plaintiff's consent, so that he could stalk and spy on her and acquire information or

photos of Plaintiff that he could use as blackmail.

63. Defendant ██████ later admitted to the FBI OIG that he had used her phone to track her

and follow her whereabouts without Plaintiff's knowledge. Contrary to FBI policy, Plaintiff was

not interviewed by OIG following Defendant ██████ admission, and the FBI and OIG took no

action regarding these violations of federal and state law and proceeded to cover them up, despite

him taking such actions in his capacity as the ██████ of the ██████ resulting in years of torment.

64. After Defendant ██████ took access of Plaintiff's phone, he followed her, stalked her,

invaded her privacy on a daily basis, and showed up at locations that she was at without her prior

knowledge. He would do so while using his government-issued vehicle.

65.  In ██████████ Plaintiff attended an event with Defendant ██████ as part of her role with

the FBI. They rode in the same vehicle, and on the way back to the area of the field office he

informed Plaintiff, who was the passenger, that he wanted to show her a park. He drove to a park

and parked the car. While the car was parked, ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

REDACTED: PUBLIC COPY

███████████████████████████████████████████████████████████

████████████████████████████████████ She cried the entire ride home.

66. The next day at the ████ Defendant ████ was offended by Plaintiff refusing to allow

him ███████████████████████████████████████ Defendant ████ called her

into a meeting causing fear and distress to Plaintiff due to Defendant ████ being highly

influential and uniquely situated to exercise coercive power over Plaintiff. She believed that if

she did not comply with what Defendant ████ wanted that he would take actions against her that

would jeopardize her livelihood, health, and overall wellbeing.

67. In or around the ███████████ one evening around 10 p.m., Defendant ████ arrived

where Plaintiff lived unannounced in his FBI-issued car with the lights on. He called Plaintiff

and told her that she had to come out and talk to him otherwise he would start talking on the

loudspeaker. Plaintiff was alarmed because she lived in ███████████████████

███████████████████████████████████████. She went

outside and got in his FBI-issued car where he drove to an empty parking lot about a half block

away. He got out of the car and demanded that they talk outside. Plaintiff asked him why they

needed to speak outside since they were ███████████████████ late at

night. Defendant ████ told Plaintiff that he had nearly died getting to her because he had driven

over 110 miles per hour with his lights and siren engaged on his FBI-issued law enforcement

vehicle to get from his house to where she lived. Defendant ████ asserted that he believed

Plaintiff was reconciling with her ex-husband because he had tracked her phone and saw that she

was at her family home earlier that evening where Plaintiff's ex-husband still resided. Plaintiff

told Defendant ████ that she had gone to the home to get clothes ██████████ because the

unsuitable basement he forced her to live in did not have room for them to keep all of their

REDACTED: PUBLIC COPY

belongings. He then pulled up his phone and had Plaintiff's ex-husband's number displayed.

Plaintiff had never provided this phone number to Defendant ███ He told Plaintiff that he

obtained the ex-husband's number because he was in the FBI and he had his ways. Defendant

███ then told Plaintiff that she was never allowed to go over to the family house again and

threatened Plaintiff by saying he was going to call her ex-husband and tell him that Defendant

███ and Plaintiff were having an affair. Defendant ███ had made comments to Plaintiff in the

past that because she ███ ████████████████████████████, he had

more control over her. In this case, he knew that if Plaintiff's ██████ ex-husband were to

think that ████████████████ that Plaintiff could be subjected to

████████████████████████████████████████

████████████████████████████

█████████. Plaintiff asked him not to make the call and Defendant ███ told Plaintiff she

would have to beg him to not make the call. He forced Plaintiff on her knees and told her to beg

him not to call. Defendant ███ then made a fake call (unknown to Plaintiff that he was not

actually making the call) pretending to talk to Plaintiff's ex-husband stating that he was having

an affair with Plaintiff. He did so to assert control over Plaintiff and Plaintiff told him that she

would do anything he asked as long as he did not do something that could result in ██████

████████████████ It was at this time that Plaintiff believed that Defendant ███

would stop at nothing to have total control over her and that if she wanted to keep her and her

family safe, she must comply with whatever Defendant ███ said. Immediately after Plaintiff

returned home and Defendant ███ had sped off, Plaintiff attempted to commit suicide for the

first time by slitting her left wrist.

REDACTED: PUBLIC COPY

68. In or around ███████ Defendant █████ told Plaintiff that he had █████████ and

was being retaliated against in the FBI for █████████ and sought her support. That month,

Plaintiff was informed and believes, and thereon alleges, that these statements were false and

were made to gain her confidence. Defendant █████ and Plaintiff met at a park, sitting in

Plaintiff's car at Defendant █████ request. Defendant █████ would often request that Plaintiff

meet him at different places so that he could talk to her. Because of her fear of what would

happen if she did not comply with him, Plaintiff would meet him as he requested. On this

evening, Defendant ████████████████████████████

████████████████████████████████████████

████████████████████ She later called him to tell him that he had acted

inappropriately. Again, she cried and cried after this ████████████████.

69. In ████████ Defendant █████ once again tried to ██████████████████

██████████ That day, he tried to ███████████████████████

This time, she got out of the car and left work to go to a friend's house because of the fear and

trauma she had just endured. Plaintiff could not go back to work that day, due to the trauma of

████████ She experienced another day of crying and emotional distress.

70. By ████████ Plaintiff believed that she must begin to accept her fate with Defendant

█████ As a ██████ ████████████ Plaintiff ████████ and the actions that Defendant

█████ took against Plaintiff made her feel incredibly uncomfortable, isolated, silenced, and

compromised.

71. Defendant █████ while using FBI technology, put surveillance on Plaintiff's phone and

downloaded pictures of her ████████████████████████████████

████████████████████ to blackmail her into further submission. He

17

REDACTED: PUBLIC COPY

threatened her by exposing pictures he took from her phone where ██████████, and continued to threaten to tell members of Plaintiff's family and her ex-husband that he was involved in a relationship with her. Defendant █████ threatened to kill himself and told Plaintiff that his daughter was dying, which she was not, to further manipulate and control Plaintiff, ultimately trying to force her to submit to a marriage proposal. He told Plaintiff that she must change her clothing style so that it complied with ███████████████████████ ██████████████████████.

72. ███████ Defendant ████████ Plaintiff after she continually told him no, which placed her at severe risk for irreparable harm.

73. Shortly after ██████████████, Defendant █████ communicated with ███████████ ████████████████████████ and referred Plaintiff and her ex-husband to an OIG investigation which resulted in a meritless multi-year investigation. As the ████████, Defendant █████ had calls with ████████████████████ prior to submitting the OIG referral to get opinions on how to submit the referral. Defendant █████ made this referral to increase his control over Plaintiff because if Plaintiff were fired from the FBI, she would be, in Defendant █████ eyes, dependent on him and Plaintiff would have to marry him.

74. Because of Defendant █████ prior position as ████████████████, which oversees both the OIG and the DRB, he used his position as a █████ to further manipulate and control Plaintiff and elevate his baseless, multi-year investigation against Plaintiff.

75. Prior to the referral to OIG, Defendant █████ had begun to pressure Plaintiff to quit her job. Upon information and belief, Defendant █████ procedural knowledge of OIG investigations made him aware that a resignation would be offered to Plaintiff in order to close the investigation and prevent a formal determination of that investigation.

76. Between ███████████████, Defendant ████ was preparing to step down and move to ████ to serve as ███████████████████, a coveted field office of his choice. It is not typical for a person who is serving as a ████ to then transfer down to the role of a █████████, however he was afforded the opportunity to move to another field office to be able to retire and receive his retirement benefit and pension, despite him breaking FBI standards of soliciting a personal relationship with a subordinate and instigating a multi-year OIG investigation. During the OIG investigation that he referred Plaintiff to, he admitted to soliciting an inappropriate relationship with Plaintiff as a subordinate.

77. When he moved to ████ at the end of ████ Plaintiff still felt that she still had to move forward with his wishes to marry her once his ongoing civil divorce was finalized, which Defendant ████ made public knowledge of. Plaintiff was afraid of what he would do when he left that could jeopardize her and her family. Plaintiff feared that she would be retaliated against by Defendant ████ including potentially losing her job ████████████████ ██████████████████████████, if she did not proceed forward with the relationship once he was no longer in the same field office. Defendant ████ continued to remind Plaintiff of his relationships throughout the FBI and that he did not become an ████ by just "being nice." Plaintiff would not become aware of the OIG investigation until ████ She felt trapped because of his OIG referral that was sent to the DRB which she knew could result in her removal from the FBI.

D.  FACTUAL ALLEGATIONS AS TO DEFENDANT ████ REFERRAL OF PLAINTIFF TO OIG

78. Due to Defendant ████ obsession with Plaintiff and in an attempt to harass and have control over her, he referred Plaintiff to the Inspection Division on ████████, which resulted in a criminal investigation by the OIG. The entire investigation was manufactured, lacked merit,

REDACTED: PUBLIC COPY

and overall, was part of Defendant ████ gender-motivated violence and harassment against

Plaintiff. Defendant ████ took such actions while acting as the ████ of the ████

79. Defendant ████ friend in the field office, ████████████████████

████████ helped push the fraudulent allegations through to the OIG. This incited an

investigation against her that lacked merit and was only made as a way for Defendant ████ to

assert additional control over her and avoid the consequences of ████████████

████████████████ which was in violation of the FBI's ████████ policy,

among other policies and laws.

80. The OIG had two males conduct all of the interviews they took of Plaintiff. The

investigators were not trauma informed and/or qualified to conduct a proper investigation with a

trauma victim.

81. The OIG allowed the investigation to remain open for an indefensible amount of time,

causing additional emotional trauma on Plaintiff, who continued to be a high performer that was

recognized for her achievements, despite the investigation pending against her.

82. The OIG's stated reason for the investigation—allegation of mortgage fraud—was

pretext for the discrimination and harassment. Plaintiff had already voluntarily and fully

disclosed the ████████ ████████ *before* she was hired. Multiple interviews,

investigations, findings, and polygraph tests determined by the FBI that she was qualified and

transparent, and therefore hirable. However, after Defendant ████ referred her to OIG it was

used as a basis to disguise discrimination on the basis of her sex, gender, ████████

████████

83. On ████████, the FBI's Office of Professional Responsibility ("OPR")

terminated Plaintiff as a ████████████ with the FBI in violation of FBI

REDACTED: PUBLIC COPY

Offense Code 4.5 for allegedly participating in a conspiracy to commit ███████ fraud, and FBI Offense Code 2.6 for lack of candor regarding: (a) certain ████████ documents regarding ████ ████████████ (b) the extent of her involvement in a ████████ (c) whether she received cash from the ████████ of a ████████ and on an unrelated matter; and (d) her relationship with ████ Defendant ████████

84. Only a small portion of the administrative file involved Defendant ████████ inappropriate relationship with Plaintiff. Defendant ████████ admitted numerous serious violations of FBI policies and standards in ████ but the FBI took no actions against him and allowed Defendant ████ to continue as a ████████ for three more years until he retired in ████████

85. Defendant ████████ FBI file was administratively closed without any adverse action demonstrating the FBI's ██████████████████████████████████████████ ██████████████████████████

86. Rather, Plaintiff, the ████████████████████████ of Defendant ████████ was terminated.

87. Although the allegations regarding fraud and theft surrounding the ████████████ were invalid, as corroborated by the US Attorney's Office declining to prosecute her and the DRB failing to uphold the results of the biased OIG's investigation, there was a finding that Plaintiff lacked candor under oath regarding the relationship with Defendant ████ The DRB's decision was rooted in a series of interviews that included vague compounded questions, incomplete exhibits, and insufficient time to recall specific encounters which created space for confusion and individualized interpretations of OIG investigators' questions regarding interactions between Plaintiff and Defendant ████ that were about ████ years prior to the interviews.

REDACTED: PUBLIC COPY

88. All other stated reasons for Plaintiff's OIG referral including the ▮▮▮▮ fraud were
reversed and found to be unsubstantiated.

89. Defendant ▮▮▮ had threatened to kill Plaintiff and himself if she talked about what
happened, and he ordered her to say that it was mutual and consensual, had started as a
friendship before it became personal, and then consensual. Prior to the final OIG interview,
Defendant ▮▮▮ contacted Plaintiff through a friend of hers stating he was suicidal and begged
Plaintiff to not talk about his abuse of Plaintiff so that he could retire and be able to take care of
his sick daughter.  Because of her fear of Defendant ▮▮▮ Plaintiff cancelled the last interview
twice before being compelled by OIG investigators to attend the third scheduling of the interview
under threat of the loss of her job. OIG informed Plaintiff that she would not have any
consequences for participating in the interview discussing Defendant ▮▮▮ relationship with
her because they believed she was a victim. Based on information and belief that OIG
investigators were aware that Defendant ▮▮▮ was abusing Plaintiff, the investigators did not
take the necessary steps to structure their interview according to the FBI's Victim's Witness
Program which recommends a victim's advocate be present during interviews involving a victim
and that interviews be conducted with a woman present when the victim is female. The interview
was conducted by two white males, the same males who had been exhaustively criminally
investigating and rehashing topics covered in Plaintiff's hiring process, her ▮▮▮▮ status,
and the initially alleged ▮▮▮ fraud for years. At the time of the interview but before
officially beginning questioning, the OIG investigators identified Plaintiff as a victim of
Defendant ▮▮▮ and reassured her that there would be no consequences stemming from this
interview. However, OIG investigators became generic in their responses when Plaintiff asked
for clarification about what they meant by Plaintiff being a victim on record, which triggered

REDACTED: PUBLIC COPY

Plaintiff's immediate fear of retaliation by OIG investigators and Defendant ███ Plaintiff became emotional during the interview and entered a survival freeze and fawn response which ultimately led Plaintiff to comply with Defendant ███ orders about how to frame their relationship. The OIG investigators then determined she lacked candor related to her relationship with Defendant ███ and she was removed from the rolls of the FBI. Defendant ███ was not, and ultimately permitted to retire with full benefits.

90. On ███████ the DRB convened to consider Plaintiff's written appeal for reinstatement. The DRB decided to uphold Plaintiff's termination. The decision by the DRB to uphold the termination was based on their discriminatory treatment of Plaintiff based on her ███ ███ sex, ███ ████ and reprisal. The actions of Defendant ███ to influence the process through his false statements was motivated by his pursuit of Plaintiff for ███ purposes. Thus, the entire DRB process was discriminatory because it was based upon input surrounding the ██████████

91. The DRB spent, at most, the entire day of ████████ working on Plaintiff's appeal. This should have included reviewing the complete investigative record, relevant FBI policy, FBI disciplinary precedent, the *Douglas* factors, and Plaintiff's Appeal. This amount of information to review would have taken far more than one day to adequately review.

92. The FBI failed to consider properly the *Douglas* factors which were in Plaintiff's favor. Instead OPR "victim-shamed" Plaintiff for opening up about the abuse inflicted upon her.

93. The DRB should have considered the complete investigative records as well as what was *not* contained in the investigative record, but which needed to be included as a matter of due process fairness.

REDACTED: PUBLIC COPY

94. Upon information and belief, the DRB failed to consider the FBI's policy on sexual harassment, or its standards of conduct for supervisory personnel.

95. In making its decision to uphold Plaintiff's termination from the FBI, the DRB failed to provide an analysis or reasoning for its decision.

96. The DRB, by determining that the OPR's actions were not "wholly unreasonable" when it found that Plaintiff lacked candor under oath regarding details of her relationship with ▉▉ ▉▉ did not prescribe a proper or accurate legal standard of review, and lacks substantial evidence to support its finding.

97. The DRB refused to allow Plaintiff to listen or review her taped interviews that they used to support their decision.  Furthermore, Plaintiff asked the FBI to interview dozens of individuals who were witness to the facts and circumstances surrounding Defendant ▉▉ but the FBI refused to do so in its investigation, instead relying exclusively of testimony of Defendant ▉▉ to terminate Plaintiff.

98. The DRB failed to consider that the OPR decision was flawed by not making a credibility determination related to Defendant ▉▉ or Plaintiff.  In fact, it failed to consider the record which showed that Defendant ▉▉ did not disclose an inappropriate relationship with a ▉▉ as he was required to do, or that he was seeking a ▉▉ relationship with a *target* of a FBI criminal investigation.

99. Defendant ▉▉ also told OIG that he had broken off all communication with Plaintiff in ▉▉ while he continued to stalk, harass, manipulate and control her through ▉▉ ▉▉

100. If the DRB thoroughly reviewed the merits of her case it would have examined the clear imbalance of power between a ▉▉ nearing retirement and recently hired ▉▉

████████████, recognized that victims of ████████████████████ may have fragmented recollection due to unresolved trauma, and that the investigative process applied to Plaintiff was unjustly initiated by Defendant ██████ and resulted in an invasive inquisition.

101. The decision of the DRB was based upon discriminatory motive and was improperly influenced by Defendant ██████ as the ██████ of the ██████ and his friends who were contributing false information to the OIG about the relationship. Defendant ██████ and others in the field office conspired to influence the OIG investigation to cover up Defendant ██████ actions and assist him in his pursuit of Plaintiff.

102. It is the FBI's written policy that a ██████████ be punished more harshly than a ████████████ when there is a finding of a ████████████████ relationship in the office. However, it is the known practice of the FBI and its OIG to allow senior executives accused of ████████████ ████████████████ to receive less discipline than ██████████employees and allow them to quietly retire with full benefits without prosecution.[1]

103. Because of the DRB's discriminatory and retaliatory actions, Defendant ██████ was allowed to retire and earn his pension after engaging in a ██████████████████████████████ ████████████████████████████████████████████████████████ The FBI instead removed Plaintiff, as the victim, from its rolls.

104. As a result of the discrimination and retaliation Plaintiff experienced, she has suffered and continues to suffer from trauma, fear, and anxiety, and has been diagnosed with PTSD and secondary amenorrhea. She lost her position in the FBI and all sources of income. She has been unable to work following her dismissal from the FBI due to the trauma and fear that has persisted since the OIG investigation began, and the constant pain of feeling mortified that the FBI, OPR,

---

[1] https://oig.justice.gov/reports/review-federal-bureau-investigations-adjudication-process-misconduct-investigations

REDACTED: PUBLIC COPY

and DRB discriminated and retaliated against her. Plaintiff now lives in fear with irreparable harm and injuries, unable to continue to be a fixture in her community, as she once was.

105. Not only did the highest-level official of the FBI ████ use his position and power to ████████████████████████████████████████ Plaintiff, the FBI covered up the actions of Defendant ██████ instead allowing him to remain with the FBI until he was eligible to retire. Instead, the FBI pursued an investigation against Plaintiff, brought by her sexual predator and harasser, which resulted in Plaintiff's termination from the FBI.

106. The FBI's OIG, the Executive Assistant Director of the Human Resource Division, and the Director of the FBI were on notice of all of the facts set forth in this complaint. The OIG covered up the allegations and the Director of the FBI has refused to even respond to the facts of this case, which were brought to his personal attention.

E. FACTUAL ALLEGATIONS RELATED TO THE FBI'S DISCIPLINARY SYSTEM

107. The legal framework for federal agencies to address employee misconduct is through what is called non-adverse actions (suspensions of 14 days or less, letters of censure, and oral reprimands) and also through adverse actions (suspensions of greater than 14 days, demotions, and removals) which is established in 5 U.S.C. Chapter 75 and 5 C.F.R. Part 752. However, the procedural protections outlined in these regulations do not apply for most FBI employees.

108. Under FBI policy, FBI employees must report all allegations of misconduct to appropriate FBI officials, who in turn are required to report them to the OIG. As with other Department agencies, the OIG can investigate any of these allegations. Normally, the OIG investigates criminal allegations or the most serious administrative allegations involving high-level FBI employees or those that implicate systemic issues.

REDACTED: PUBLIC COPY

109. Most allegations of less serious administrative misconduct are referred back to the FBI for appropriate handling. The percentage of misconduct investigations of FBI employees conducted by the OIG, the Department's Office of Professional Responsibility, or the Department's Public Integrity Section is smaller than the percentage handled by the FBI. According to the OIG's Review of the FBI's Disciplinary System, the FBI conducted 90 percent of the misconduct investigations (69 percent were delegated to the divisions to complete), the OIG conducted 6 percent, and the Department's Office of Professional Responsibility or Public Integrity Section conducted four percent.

110. The Internal Investigations Section in the FBI's Inspection Division oversees the reporting and investigative phases of the disciplinary process. Investigations of misconduct by the FBI are handled by either personnel in the FBI's Inspection Division or designated FBI staff in field and headquarters divisions overseen by the Internal Investigations Section.

111. During the adjudicative phase, overseen by the FBI's OPR, the FBI determines whether the allegations are substantiated and, if so, FBI OPR proposes and decides the discipline. For oral reprimands, letters of censure, and suspensions of 14 days or less (known as "non-adverse actions"), there is no formal proposal stage and FBI OPR Unit Chiefs decide the discipline that will be imposed. For suspensions greater than 14 days, demotions, and removals (known as "adverse actions"), the Unit Chiefs must propose discipline and the FBI OPR Assistant Director makes the disciplinary decision. Generally, the FBI attempts to complete the investigation and adjudication of a misconduct case within 180 days; however, the FBI consistently fails to meet this deadline, often keeping agents under investigation for over a year or more.

REDACTED: PUBLIC COPY

112. In this case, Plaintiff was referred to an investigation in ████ and was not removed from the rolls of the FBI until ████—far greater than the 180 days.  This was done so that Defendant ████ could retire with full benefits.

113. In the implementation phase, final discipline should be imposed and documented in employees' personnel records to show that the discipline was implemented. Discipline resulting in suspension, demotion, or removal should be documented on an Office of Personnel Management Standard Form 50 (SF-50) in the employee's personnel records to confirm that discipline was implemented. Notices of oral reprimands and letters of censure should also be maintained in an employee's personnel records.

114. However, this facially neutral process is not applied uniformly or fairly. As a result, women are not protected from harassment and discrimination in this disciplinary process in the same way as men.

115. Two studies by the DOJ OIG have revealed a series of disparities in the FBI's disciplinary process, finding that penalties are less severe for senior FBI executives than line employees. These studies are labeled as "A Review of Allegations of a Double Standard of Discipline at the FBI" (November 2002) and "A Review of Allegations of a Continuing Double Standard of Discipline at the FBI" (November 2003).  Because most executives are males in the FBI, this produces a disparate impact on women in the FBI.

116. In a May 2009 study by the OIG, the disciplinary system was reviewed[2]. The study found as follows for each of the phases of the disciplinary process:

---

[2] *Review of the Federal Bureau of Investigation's Disciplinary System,* U.S. Department of Justice, Office of the Inspector General, Evaluations and Inspections Division (May 2009), https://oig.justice.gov/reports/FBI/e0902/final.pdf.

REDACTED: PUBLIC COPY

-   In the reporting phase, potential misconduct was not consistently reported to FBI headquarters or to the OIG as required by FBI policy.

-   In the investigative phase, the FBI's investigations of misconduct generally were thorough and conducted in a consistent manner, and the FBI had improved its timeliness.

-   In the adjudicative phase, most of FBI OPR's penalty decisions for misconduct that they reviewed were reasonable. However, it found inconsistencies in the discipline imposed and a lack of adequate explanation for those inconsistencies in some cases. In addition, it found that the FBI OPR Assistant Director has at times considered unwritten information she received outside the normal disciplinary process before making disciplinary decisions.  As in the investigative phase, the timeliness of the adjudicative phase had also improved.

-   In the appellate phase, it found that the majority of decisions for non-SES employees appeared reasonable. However, it found that almost all SES appeals were mitigated, and it found that most of these decisions were unreasonable. It also found a lack of clear guidance about the appropriate standard of review the appellate officials should apply when reviewing penalties imposed by FBI OPR. As in the previous two phases, the timeliness of the appellate phase also had improved.

117. It found that a significant percentage of FBI employees surveyed believed that there was a double standard of discipline in the FBI for higher- and lower-ranking employees. The review of FBI disciplinary decisions found that allegations of misconduct were much more likely to be unsubstantiated against SES employees than non-SES employees. It found even more significant differences in the rates that SES employees' penalties were mitigated on appeal (5 out of 6, or 83 percent of the time) as compared to non-SES employees' penalties (44 out of 247, or 18 percent

REDACTED: PUBLIC COPY

of the time). In addition, as noted in the previous finding, it concluded that the mitigation of most of these SES appeals was unreasonable.

118. Over 77% of SES positions in the FBI are held by men. Furthermore, women hold a smaller percentage of SES roles when compared to the percentage of women in the FBI overall creating an adverse impact upon female employees.

119. In the 2009 OIG Review, it was concluded that the adjudicative decisions reached by FBI OPR generally were reasonable.[3] However, it was found that some of FBI OPR's decisions on what penalties to impose contained inconsistencies that could not be explained by the record in the case files. In cases reviewed, it was also found that variations in discipline imposed among cases that appeared to be similar. Some of these cases lacked a discussion of FBI OPR's assessment of precedent cases, making it difficult to assess whether there was sufficient justification for the disparity in penalties between similar cases. In other cases, it was found that FBI divisions did not submit an assessment of *Douglas* Factors to FBI OPR, as required by the FBI's Internal Investigations Supervisor's Guide.

120. On top of the other factors affecting a woman's decision on whether or not to report harassment, an OIG report stated the FBI does not ensure that disciplined employees serve their suspensions.[4] The report found cases where FBI employees either did not serve their suspensions at all or were suspended for the wrong amount of time. The combination of every systematic failure in the process undermines its credibility, creating artificially low numbers of reported discrimination and obscuring the magnitude of the problem. In Women, Retention, and Work-

---

[3] *Review of the Federal Bureau of Investigation's Disciplinary System,* U.S. Department of Justice, Office of the Inspector General, Evaluations and Inspections Division (May 2009), https://oig.justice.gov/reports/FBI/e0902/final.pdf.
[4] *Review of the Federal Bureau of Investigation's Disciplinary System,* U.S. Department of Justice, Office of the Inspector General, Evaluations and Inspections Division (May 2009), https://oig.justice.gov/reports/FBI/e0902/final.pdf.

REDACTED: PUBLIC COPY

Life Balance: A Case Study Analysis of the FBI, Prepared for the FBI Human Resources Division and Women's Advisory Committee, Dr. Helen H. Yu found that almost 50% of the respondents who experienced sex-based discrimination chose not to file a formal complaint believing nothing would be done and 20% feared the negative backlash and/or being labeled as a troublemaker.[5]  Dr. Helen H. Yu found similar results of non-reporting where 31.2% of the women in this study experienced (perceived) sexual harassment with only 19.3% making a formal report.[6]

F.   <u>FACTUAL ALLEGATIONS AS TO DEFENDANT ███ FOLLOWING HIS DEPARTURE FROM ███</u>



121. In ███, once Defendant ███ stepped down as ███ and moved to ███ at the ███ Defendant ███ maintained many phone numbers and email addresses that he would use to contact Plaintiff. Even when she tried to block his number, he would call from several different phone numbers, forcing Plaintiff to answer (her job was to be on call and answer phone calls from the community). He would call and text her hundreds of times in a single day, incessantly harassing Plaintiff.



122. At this point, Defendant ███ had asserted complete manipulation and control over Plaintiff. Plaintiff believed as part of her ███ ███ that she had to go along with whatever Defendant ███ had said because he had ███ ███ ███ While Plaintiff felt trapped in her circumstances, she continued to beg Defendant ███ to release her. For Plaintiff, this meant that

---

[5] Dr. Helen H. Yu, *Work-Life Balance: An Exploratory Analysis of Family-Friendly Policies for Reducing Turnover Intentions Among Women in U.S. Federal Law Enforcement,* DOI (April 20, 2018), https://doi.org/10.1080/01900692.2018.1463541.
[6] *Id.*

**REDACTED: PUBLIC COPY**

he would safely relinquish control over her so as not to ███████████████, and

with the ultimate goal that he would leave her alone.

123. In ████████ Defendant █████ returned to ██████ He wanted to meet with

Plaintiff, adding this request as a requirement to "release her." Defendant █████ would not accept

Plaintiff's insistence that she did not want to have any form of relationship with him, and she

wanted him to leave her alone. Instead, he continued to threaten Plaintiff with exposing the

compromising photos of her he took from her phone without her permission while he was acting

as the █████ of the █████ talking to ████████████████████

███████████, and inciting investigations against Plaintiff. If Plaintiff was to be safely released

from his control, Defendant █████ required Plaintiff to fulfill certain conditions, which he would

continually change, keeping her stuck in his control. During this visit to ████████ he requested

Plaintiff meet him at his hotel. He once again ████████████████████████

██████████████████████

124. While Defendant █████ was living in ██████ and no longer in her chain of command, he

continued to stalk and place surveillance on Plaintiff. He would require Plaintiff to send him

proof of Plaintiff canceling or declining invitations to events that were necessary for her role in

the FBI, including conferences she was ████████ by FBI HQ. Defendant █████ ordered

her to cancel her attendance in writing and forward the cancellation to him for proof.

125. Defendant █████ in his individual capacity, would also require that she show proof of

every time that she left her home and each place that she went. For example, if she were at her

home and wanted to visit her mother, he would require her as part of her permission to leave the

home to take a picture of her home, with the time, when she left. She would then have to take a

picture of her mother's home when she arrived. She would have to show that there was only

REDACTED: PUBLIC COPY

enough gap in time for her to travel, making no other stops. When she would leave her mother's home she would once again have to take a picture of her mother's home with the time and take a picture of her house once she returned home documenting the commute. Defendant ███ forced her to do this each and every time she left her home for years.

126. Beginning in ███████ Defendant ███ acting in his individual capacity, would make Plaintiff keep her phone on speaker so he could listen in on her as she carried out her day. While Plaintiff was at home, he would listen in for hours while she went about her daily activities including helping her ████████████ and completing housework. He also did this when she was driving and wanted Plaintiff to keep him on speaker while she attended events for her job. If she didn't place her phone on speaker at events, Defendant ███ would call the location and ask to speak to her. Defendant ███ continued to reach out to her and expand the requirements for her safe release. For example, in ██████████ he told her that he needed Plaintiff and that if he didn't have her, he could hurt Plaintiff or himself.

127. While Defendant ███ acting in his individual capacity, was living in ████ he continued to stalk Plaintiff and keep surveillance on her. For example, one day she planned to meet with a former FBI colleague for lunch. On her way there she received a phone call from Defendant ███ asking why she was going to lunch with her co-worker. This was not information that Plaintiff had shared with Defendant ███ and this scared her that he was tracking everything that she was doing. She had to pull off the road and vomit from the emotional distress this caused her. She ended up canceling the lunch, only years later being able to tell her co-worker why she was forced to cancel at the last minute.

128. In ██████████ Defendant ███ told Plaintiff that he needed her to come to ████ while he took the ██████ to become ████████████ in ██████ He told Plaintiff that if she

**REDACTED: PUBLIC COPY**

supported him through the ███████ he would release her. Plaintiff did go in hopes that if she did, he would finally release her. However, Defendant ████ continued to tell Plaintiff that he would commit suicide, that his daughter was dying, and that he was in a bad place in his career because he had tried to help her. During this visit, ████████████████████████

129. In ████████████ Defendant ██████ continued to email, call, text, and reach out to Plaintiff's family and friends from multiple emails and phone numbers. He sent hundreds of emails from multiple email addresses including an FBI email address and later an email address connected to his law practice, as well as other personal emails. While in the FBI, Defendant ████ even set up an email based on a law firm under his name. This was while he was still an active ███████████ with the FBI, and used his fake law firm address, illegally representing himself as engaged in the practice of law to further intimidate Plaintiff since FBI employees are prohibited from the private practice of law while employed at the FBI. Plaintiff is informed, and believes, that Defendant ██████ did not get permission for outside employment prior to setting up his law firm while in the FBI.

130. In either ██████████████████████ Plaintiff was told by Defendant ██████ that he needed her to travel to ████████ for an in-person conversation about "critical topics." At that point, she wanted to be released from his control and relationship, so Plaintiff complied and went to him hoping that Defendant ██████ would release her and finally leave her alone. When she arrived, she did not leave the airport, but rather stayed at the Marriott located in the airport. However, after her arrival, there was nothing Defendant ██████ shared "in-person" that he could not have shared by phone. Plaintiff attempted to leave the Marriott and return home earlier than her scheduled flight. However, Defendant ██████ aggressively continued to grab her phone from her hands and scold her in front of the public. Plaintiff was mortified and publicly

REDACTED: PUBLIC COPY

crying. Unfortunately, Plaintiff's multiple attempts to secure an earlier flight home were

unsuccessful. However, either a Delta representative or a Marriott representative called the

█████ Police Department to report abuse and to report that a potential human trafficking victim

was being exploited causing two police officers to arrive at the scene. The dispatch call was for

an "alleged human trafficking victim." Defendant █████ and Plaintiff were separated and

questioned by police. Defendant █████ informed the police officer that he was a █████████

with the FBI causing the police officers to leave and stop any further investigation of the issue.

Defendant █████ told Plaintiff not to report the incident to the security division of the FBI and

was worried he had to use his badge to resolve the incident. Plaintiff's distressed and hopeless

emotional state following this encounter with Defendant █████ resulted in her attempting to

commit suicide by attempting to slit her left wrist a second time when she returned to █████

Following her suicide attempt she had to wear long sleeves to cover the injury until it was

completely healed.

131. Throughout all of the in-person interactions, as alleged herein, and at other times in

general, Defendant █████ wore a gun on his person as an FBI █████, but this fact made

Plaintiff fear for her safety and was terrified by his use of weapons to further control her.

132. In the beginning of █████ Defendant █████ while acting in his individual

capacity, called Plaintiff nonstop and insisted that she speak with him. When she finally

answered, he said that as a condition of her release he wanted to meet with her again. She refused

to see him and had two trusted friends who she had confided in to help her escape the control of

Defendant █████ join a phone call with her where they told Defendant █████ to release her and

that the relationship was over. After that call, she changed her phone number yet again, but he

would continue to find her number and call her.

REDACTED: PUBLIC COPY

133. ████ prior to Plaintiff's fourth interview with OIG for the investigation brought by Defendant ████ against her, he reached out to Plaintiff's two close friends who had previously tried speaking with him to relay to Plaintiff that he was suicidal and "circling the drain" and was afraid that Plaintiff would expose him and what he had done to OIG. She feared for her safety and while she tried to communicate to the OIG about the fears he had instilled in her, the OIG instead recommended she be removed from the FBI for a lack of candor, while the investigation was put off for █ years until Defendant ████ could retire with a pension. All allegations of ████ fraud were ultimately found baseless.

134. Defendant ████ continuous manipulation resulted in ████████████ ████████████.

135. ████ Defendant ████ reached out to Plaintiff's ████ ████ and family members located in ████ trying to make further contact with her.

136. Defendant ████ wrongful conduct that began while he was employed in the FBI continued after his retirement by calling Plaintiff's family and friends to persuade her to continue a relationship with him in order for her to not divulge information about what he had done during the course of his control over her in an effort to keep his name clear. He continued to make harassing calls from unknown phone numbers to Plaintiff causing her to continue to have to change her number to get away from Defendant ████

137. The last wrongful act giving rise to liability in this action occurred in ████ when Defendant ████ again contacted her family in ████ for information about Plaintiff requiring the counsel of Plaintiff to send a cease-and-desist letter to Defendant ████ This continued contact has caused Plaintiff severe emotional and psychological trauma that persists through today.

REDACTED: PUBLIC COPY

### G. EMOTIONAL AND OTHER HARM

138. The conduct described above caused Plaintiff emotional and other forms of harm

proximately caused by the discriminatory and retaliatory conduct of the FBI and Defendant

████ tortious conduct.

139. Plaintiff was under such stress and anxiety in ████████ that she went to the doctor

and fainted at the office. Plaintiff was transported to the hospital and admitted for stress and

anxiety because she knew she had to see Defendant ████ the next day and feared another ████

At this time, Defendant ████ began telling Plaintiff that she was his ████████ and argued to

her that they were ████████ ████████████. This was done to allow him to more

freely continue to ████████ her and maintain his emotional and mental control over her.

140. As a further result of the discrimination and retaliation Plaintiff has experienced, she was

hospitalized for stress and anxiety and has suffered from trauma, fear, and anxiety. She has been

diagnosed with permanent injuries including Secondary Amenorrhea in ████ as a result of

the ongoing stress and strain her body went through. Further, Plaintiff's hair began turning white

in ██ and she has lost more than half of her hair. She received months of laser treatments on her

head in ██ along with treatments for hives breakouts which started in ██ until the present due

to the ongoing stress endured due to her termination and underlying circumstances related to her

removal from the FBI. At the same time until ████ Plaintiff developed flu-like symptoms

following encounters with Defendant ████ or encountering any references to him by others at

work or in the community that would last from a couple days to a week. Plaintiff still has physical

manifestations of her fear and anxiety, like eye twitching, simultaneous fatigue and insomnia,

hypervigilance, and nausea. Additionally, beginning in ████ Plaintiff developed an unhealthy

pattern of continuous crying for days at a time while attempting to hide from Defendant ████

REDACTED: PUBLIC COPY

following every ███████████████████ until he was able to re-establish contact and control

over her through manipulation and intimidation.

141. Plaintiff has also been diagnosed with severe Post Traumatic Stress Disorder (PTSD) by

a licensed psychologist as a result of the harm and trauma experienced with Defendant ████ and

retaliation from the FBI. Plaintiff's emotional trauma is such that she has great difficulty

retaining material items that are used to recall or retain information about her experiences with

Defendant ████ as they become associated with the trauma she has experienced and thus feels

the need to purge them. She has disposed of phone numbers, email addresses, phones, laptops,

clothes, and a vehicle because her fear and trauma were transferred and represented in these

items. Plaintiff has become reclusive and experiences anxiety when engaging with others outside

of her immediate family and friends, including attending community gatherings and grocery

shopping and relies heavily on her immediate friends and family to perform daily tasks. She has

been unable to engage in any ██████████ that could result in ██████████.

142. Plaintiff has suffered damage to relationships in ██████████

communities due to Plaintiff's separation from the FBI, including the discontinuation of several

relationships with influential community leaders as they are fearful of what Plaintiff could have

done to cause the separation. Plaintiff suffers in silence as she is unable to share information

about the actual cause of separation due to the potential repercussions Plaintiff and her ██████

could suffer if her ███████████████████

██████████

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF:
### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964:
### SEX, RACE, NATIONAL ORIGIN, ETHNICITY, AND RELIGION DISCRIMINATION AND
### HARASSMENT

REDACTED: PUBLIC COPY

(AGAINST DEFENDANT GARLAND, FBI-Agency)

143. Plaintiff incorporates by reference the allegations of paragraphs 1-142 above, inclusive, as if set forth fully herein.

144. The discriminatory actions described herein violated Plaintiff's rights protected by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-16.

145. The FBI intentionally discriminated against Plaintiff because of her sex, race, ████ ████████████████████ when they failed to investigate her allegations, and terminated her from the FBI to cover up the criminal actions of ██████████████

146. The FBI failed to ensure Plaintiff a hostile-free work environment.

147. As a result of this conduct, Plaintiff has and will continue to suffer compensatory damages and damages for emotional distress, permanent PTSD, and deprivation of her civil rights as a result of the FBI's conduct.

SECOND CLAIM FOR RELIEF:
RETALIATION IN VIOLATION OF THE CIVIL RIGHTS ACT OF 1964
(AGAINST DEFENDANT GARLAND, FBI- Agency)

148. Plaintiff incorporates by reference the allegations of paragraphs 1-147 above, inclusive, as if fully set forth herein.

149. The FBI retaliated against Plaintiff when she filed her initial EEO complaint, and through Defendant ██████ threatened her with physical harm if she used the EEO process. The FBI, through Defendant ██████ intentionally interfered with her protected rights under Title VII, while failing to investigate the facts, which were widely observed by others in that field office and were further manipulated by Defendant ██████████ in conspiracy with Defendant ████████

150. Plaintiff has and will continue to suffer compensatory and special damages as a result of this illegal retaliation.

REDACTED: PUBLIC COPY

THIRD CLAIM FOR RELIEF:
CIVIL BATTERY
(AGAINST DEFENDANT ██████ individually)

151. Plaintiff incorporates by reference the allegations of paragraphs 1-150 above, inclusive, as if fully set forth herein.

152. Defendant ██████ acting in his individual capacity outside the scope of his employment with the FBI, intended to commit an act of unwanted contact and/or caused imminent apprehension of such an act against Plaintiff. He did so by, *inter alia:*

a. Isolating Plaintiff in closed quarters and dismissing any bystanders; and

b. Demanding or threatening ██████████

153. Defendant ██████ did commit unwanted contact with Plaintiff's person or property in a harmful or offensive manner, including but not limited to ████ against Plaintiff.

154. Defendant ██████████████ of Plaintiff caused harm, including physical, mental and/or emotional harm to Plaintiff.

155. Defendant ██████ unlawful conduct constitutes a willful and wanton action, was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

FOURTH CLAIM FOR RELIEF:
CIVIL ASSAULT
(AGAINST DEFENDANT ██████ individually)

156. Plaintiff incorporates by reference the allegations of paragraphs 1-155 above, inclusive, as if fully set forth herein.

157. Defendant ██████ intended to cause apprehension of harmful or offensive conduct against Plaintiff when he threatened to kill her and harm her family if she spoke to anyone about his ███████████████████ He did so by, *inter alia:*

40

REDACTED: PUBLIC COPY

a.  Isolating Plaintiff in closed quarters and dismissing any bystanders;

b.  Demanding or threatening ███████████;

c.  Cornering, chasing, blocking, or otherwise using his heft to cause Plaintiff to fear that Defendant ████ had the ability to carry out his physical threats;

d.  Threatening harm to Plaintiff's career and reputation if she did not comply with the solicited actions of Defendant ████ and

e.  ████████████████████████████

158. Defendant ████ actions did, in fact, cause Plaintiff to fear and experience imminent harmful or offensive contact by Defendant ████

159. Defendant ████ unlawful conduct constitutes a willful and wanton action, was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## FIFTH CLAIM FOR RELIEF:
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
(AGAINST DEFENDANT ████ individually)

160. Plaintiff incorporates by reference the allegations of paragraphs 1-159 above, inclusive, as if fully set forth herein.

161. Defendant ████ extreme and outrageous conduct intentionally or recklessly caused severe emotional distress to Plaintiff.

162. At all times relevant to this claim for relief, Defendant ████ was acting in his individual capacity and had no official or legitimate law enforcement reason to perform the acts stated herein.

41

**REDACTED: PUBLIC COPY**

163. Defendant █████ outrageous conduct was not the type of ordinary rude or obnoxious behavior that a woman should be expected to weather. Rather, Defendant █████ conduct exceeded all possible bounds of decency.

164. Defendant █████ acted with intent or recklessness, knowing that Plaintiff was likely to endure emotional distress. Indeed, he used this distress to subdue and threaten Plaintiff and prevent her from complaining or leaving his control based on his actions. He did these actions with deliberate disregard as to the high possibility that severe emotional distress would occur.

165. Defendant █████ conduct caused suffering for Plaintiff that no reasonable person should have to endure.

166. Defendant █████ unlawful conduct constitutes a willful and wanton actions, was outrageous and malicious, was intended to injure Plaintiff, and was done with conscious disregard of Plaintiff's rights, entitling Plaintiff to an award of punitive damages.

### SIXTH CLAIM FOR RELIEF:
█████████████████████

167. Plaintiff incorporates by reference the allegations of the paragraphs 1-166 above, inclusive, as if fully set forth herein.

168. Defendant █████ conduct, as described above, constitutes ████████████, to wit:

    a.   He engaged in ████████████████

    b.   He used ████████████████; and/or

    c.   He knew or had reason to know that Plaintiff ████████████████

         ████████████

REDACTED: PUBLIC COPY

169. As a direct and proximate result of Defendant ████ ██████████████, Plaintiff suffered damages, physical injury, emotional distress, anxiety, humiliation, and other consequential injuries, and other damages to be determined.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the following relief:

a. An award of all damages that Plaintiff has sustained as a result of the FBI's conduct, including back pay, front pay, general and special damages for lost compensation and job benefits she would have received but for the discriminatory practices of the Federal Bureau of Investigation;

b. All filings in this case be under seal and/or redacted from the public;

c. Reinstatement of Plaintiff at the FBI;

d. An award of compensatory damages for emotional distress that Plaintiff has sustained against the FBI in the amount of $1,000,000;

e. An award of compensatory damages for emotional distress that Plaintiff has sustained against Defendant ████ in the amount of $10,000,000;

f. An award of punitive damages for the intentional harm and damages Plaintiff has sustained against Defendant ████ in the amount of $50,000,000;

g. Costs incurred, including reasonable attorneys' fees, to the extent allowable by law;

h. Pre-Judgment and Post-Judgment interest, as provided by law; and

i. Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

This the 9th day of January, 2023.

REDACTED: PUBLIC COPY

Respectfully submitted,

/s/ Darcie R. Brault
Darcie R. Brault
McKnight, Canzano, Smith, Radtke & Brault,
P.C.
423 N. Main Street, Suite 200
Royal Oak, MI 48067
(248) 354-9650
(248) 354-9656 (fax)
dbrault@michworkerlaw.com
MI Bar Number P43864
*Local Counsel for Plaintiff*


/s/ David J. Shaffer, Esq.
David J. Shaffer
D.C. Bar Number 413484


/s/ Kelley Brooks Simoneaux, Esq.
Kelley Brooks Simoneaux
D.C. Bar Number 187844


David Shaffer Law, PLLC
1629 K Street, NW
Suite 300
Washington, DC 20006
Phone: 202-210-7424
David.Shaffer@davidshafferlaw.com
Kelley.Simoneaux@davidshafferlaw.com

*Pending Admission*

REDACTED: PUBLIC COPY

<u>**JURY TRIAL DEMANDED**</u>

Plaintiff demands a jury trial as to all claims so triable.

This the 9th day of January, 2023.

<div style="margin-left: 50%;">

Respectfully submitted,

<u>/s/ Darcie R. Brault</u>
Darcie R. Brault
McKnight, Canzano, Smith, Radtke &
Brault, P.C.
423 N. Main Street, Suite 200
Royal Oak, MI 48067
(248) 354-9650
(248) 354-9656 (fax)
dbrault@michworkerlaw.com
MI Bar Number P43864
*Local Counsel for Plaintiff*

<u>*/s/* David J. Shaffer, Esq.</u>
David J. Shaffer
D.C. Bar Number 413484

<u>*/s/* Kelley Brooks Simoneaux, Esq.</u>
Kelley Brooks Simoneaux
D.C. Bar Number 187844

David Shaffer Law, PLLC
1629 K Street, NW
Suite 300
Washington, DC 20006
Phone: 202-210-7424
David.Shaffer@davidshafferlaw.com
Kelley.Simoneaux@davidshafferlaw.com

*Pending Admission*

</div>